PAUL S. D. BERG, Ph.D. & ASSOCIATES

Paul S. D. Berg, Ph.D.
A Psychological Corporation

June 26, 2007

James Missett, M.D., Ph.D.
1187 University Drive, Suite 8
Menlow Park, California 94025-4423

Re: Deborah Henson

Dear Dr. Missett:

On May 22, 2007, I conducted the psychological portion of
the IME of Ms. Henson.  She informed me that she had been
examined by you the previous day.  I understand that this
report is being produced to Federal Court and that it must
conform with the requirements of Rule 26 of the Federal
Code.

I am attaching to this report a copy of my current
Curriculum Vitae.  In addition to my education and my work
experience, it also contains a list of all of my
publications and professional presentations.

My fees for my services are billed at my usual and
customary rates of $350 per hour for all evaluation
activities, other than sworn testimony, which is billed at
$500 per hour.

I am also enclosing a list of cases in which I have given
sworn testimony for the past 13 years.

My opinions in this case are based on all of the work that
I performed for this evaluation, which includes my personal
examination of Ms. Henson, the psychological testing I
produced, which is also being sent with this report, as
well as various records that I reviewed prior to examining
Ms. Henson, including the following materials: the

Complaint; Declaration of Linda Doty (03/23/07); Declaration of Dr. Roger Agre (03/22/07); Declaration of Deborah Henson in Support of Discovery Motions (03/27/07); and a letter from Ms. Henson to Dr. Agre of the same date. After I examined Ms. Henson, I had the opportunity to review the deposition taken of Dr. Agre, as well as two volumes of Ms. Henson's deposition.

### Opinions

1. Based on this examination, the primary findings regarding Ms. Hensons' psychological makeup is that she suffers from personality dysfunctions.

2. Such dysfunctions are not caused by any specific adult events, but are part and parcel of her personality and are developed typically by no later than late teenage or early adult years.

3. The Axis I diagnosis is a Dysthymic Personality, with the possibility of her having also suffered from episodes of Major Depression at various points in her life.

4. As to personality disorders, Axis II diagnoses, I find that she suffers from a Personality Disorder (NOS), with features of Histrionic, Dependent, Schizoid and Avoidant, and on a clinical basis, characteristics of a Borderline Personality Disorder.

5. There is no clear current evidence of a post traumatic stress disorder, but if, in fact, she has any elements of that, it cannot reasonably be related to events of her employment at Lassen County and instead the etiology would be found in early events of her life.

6. Her predominant mood is of anger, much more than depression or anxiety, and this characteristic is very similar to what she presented with in previous employment situations in her life.

7. There is no evidence based on my examination that she suffers any psychological disorder which can be attributed to her having been employed by Lassen County, other than this represents simply her latest arena on which she has focused her own chronic problems.

2

Prior to the onset of the examination, I gave Ms. Henson my customary descriptions of the process.  I explained to her that I was retained by attorneys for the defendants to work with you on this examination, that I was not providing her any treatment or establishing any type of doctor/patient relationship.  I told her that our communications would not be confidential, that I would be very likely writing a report and might be called upon to testify by any of the parties.  I explained to her that I would not take any detailed history of early background or details about her work experiences at Lassen County, since that material had already been covered by you.  I told her that she can take breaks whenever she required that and to feel free to ask questions.  It was clear to me that she understood this description of the examination and was able to give consent to proceed.

#### Observations

Ms. Henson immediately displayed a very pressured speech, her voice loud and her speech voluminous.  Throughout the examination she expressed her beliefs about the unfairness of the examination, based in part upon some previous experiences and also apparently what her attorney has told her about the present process.

She maintained good eye contact throughout the examination, and while her pressured speech continued, the degree of it varied.  She was clearly tense, angry, and very focused on her litigation.  In fact, she told me she didn't care how long this process took or when the trial would occur.  However, she also told me that she is kept very busy by having to provide information to her attorney and that this causes her to relive the many negative experiences.

Ms. Henson is a 54-year-old white female, born 11/10/52.  She was very casually, but neatly, dressed.  Her major dimensions are 5'7" and between 190 to 195 pounds and she told me that she gained 40 to 50 pounds since she left Lassen County on July 1, 2004.  She believes the weight gain is a direct function of the many medications that she has been taking since then.

The only two medications she is currently taking are Xanax, 2 mg, time release every morning and BuSpar twice a day at 105 mg each.  Both of them are prescribed by her treating psychiatrist, Dr. Agre.  She told me she has been seeing

3

him for three years, starting about a month or two after she left Lassen County. It was very difficult to get some estimate of the frequency of her visits. She said sometimes she sees him at least once a month, sometimes as much as three or four times a month. She says if she needs to see him, he always gets her in during a cancellation. She said that she has regular appointments and as-needed appointments, but again could not describe the frequency.

She told me that he charges $175 a session and she pays for those out of her own pocket. As of last November she was approved for Medicare, but it hasn't really kicked in yet and she believes she will have a co-pay once Medicare begins to pay.

Her regular physician, at least of record, is Dr. Stephen Elliot, although she hasn't seen him since July 1, 2004. She told me she has not been ill physically or required any medical help.

Prior to her current psychotropic drugs, she has tried a variety of others and said she couldn't remember them all, but believes they included Wellbutrin, Prozac, Zoloft, Effexor, and for a while Requip for a restless leg syndrome, which a psychiatrist told her was due to her emotional condition. She said she couldn't handle the Requip because it made her groggy. All of the others also gave her side effects, such as Effexor, which gave her nightmares and none of them helped with her depression.

I asked Ms. Henson to describe for me her Activities of Daily Living. She currently resides in a house with her friend Linda Doty in Carson City. She pays rent, but obviously does a lot of help around the house as well. She told me that she's agoraphobic and doesn't leave the house. Her daily activities include doing chores around the house, taking care of her various animals including four dogs, some cats, and a recently-deceased parrot. In addition, she says that "I'm neurotic about cleanliness," meaning that she showers three times a day and attributes it to her being depressed. However she said she's always been very clean, but before this she only showered two times a day.

The house is very big and she does all of the cleaning, as well as yard work and laundry. Around 10:00 each day she takes a nap, what she described as a "Clinton power nap," where she either sleeps or rests and gets her refreshment.

4

She also said, "I can get rested by thinking." She does
not watch much television, typically no more than the news.
She is a member of Netflix. She also reads a lot,
particularly enjoying works by Elie Wiesel. Apparently she
identifies with his experiences, although she told me that
"My situation is not exactly the same as his." She said
that is she not an evangelical, but very spiritual. She
does not like to read fiction. She does read magazines and
various newspapers.

She measures her social life as "none." She is very
specific about that, stating that she hasn't seen a single
friend since she moved out of Lassen County on June 16,
2004. Her isolation is so complete that when Linda's
family comes over for visits, she stays in a hotel so they
won't see how depressed she is.

Again, she told me that medically she is doing well,
although she has a blood pressure measuring device. She
said Dr. Agre suggested it, although her blood pressure is
quite good and she hasn't checked it in awhile. She told
me she spends a lot of her time gathering materials for her
attorney.

Before starting the psychological testing, I asked her if
she had previous experience with tests and she described a
number of instances where she specifically took the MMPI.
The first one she described was ten years ago as part of a
Workers Compensation claim. Apparently at that time she
was working in El Dorado County's Child Protective Services
and there was a pedophile working for another agency,
Mental Health, and she was one of the people that reported
him. Despite being a mandated reporter, apparently this
man sued her and the stress from that gave rise to her
Workers Comp claim. She said the county she worked for was
very supportive of her.

She also took an MMPI about twenty years ago when she was a
plaintiff in a lawsuit. She sued the California Youth
Authority where she had been working at their Stonyford
Facility. She said that the behavior of her coworkers
towards her was to created "torture." She further told
that this was before Anita Hill and Clarence Thomas and
people were not aware of sexual harassment in the same way.
She said she was very badly harassed and tortured by the
male staff. She went to see a Sacramento psychiatrist, Dr.

5

Donlan, who treated her and who characterized what happened
to her as sexual assault and torture. The case went to
trial and there was a defense verdict. She believes the
reason that she was unsuccessful in the lawsuit is because
she was a homosexual and that was even more of a
disadvantage twenty years ago. She talked at great length
about how despicable the defense attorney was. The
defendants also had her see a psychiatrist for an
examination, Dr. Kaldor. She told me that he only spent
one hour with her, but wrote up a huge report and charged
between $70,000 to $100,000 for his work.

In relation to this event, she had forgotten to tell
something to Dr. Missett and asked me to convey it to you.
What she wanted you to know is that the day after the
verdict, she moved to Reno and two years later she got a
call from either an investigator or an attorney
representing a woman who was also suing CYA for similar
claims. She did not want to get involved, but apparently
felt it was important or vindicating that someone else had
similar claims.

As I mentioned earlier, Ms. Henson does not complain of any
medical problems. She did have a hysterectomy in 2000
because of fibroid tumors and that was her only surgery. I
took her through a checklist of neuropsychological events
and she denied any such difficulties as well.

She has never been married, never been arrested, and hardly
ever uses alcohol. She said many years ago her
psychiatrist, Dr. Donlan, told her that she shouldn't drink
because she had an alcohol propensity and that was based on
a family history which apparently was her father. He also
cautioned her not to drink, because of her various
medications.

She smoked marijuana once in college and that gave her a
full blown panic attack and she never did that again.

I then asked her to describe for me the various ways in
which she feels that her employment with Lassen County has
affected her.

She said the single most important injury she suffered is
that "I don't want to live anymore and I don't know that I
ever will." I asked her whether she has ever tried to harm
herself and she said no, similarly has never made any

6

plans. However, she said she had suicidal thoughts and that she has discussed this Dr. Agre a couple of times. She said he became concerned and wanted to hospitalize her, but the two facilities he wanted to use were either in Arizona or in San Diego and she did not want to be put into a locked ward. She says that she often tells God that "You can take me home any time now." She has no current plans to harm herself.

She told me that the only times in her life she ever felt so badly were the incidents involving the California Youth Authority and then the lawsuit in Sacramento following the reporting of possible molestation. She then told me that she, herself, was sexually molested as a child. However she said that that has never affected her work and, in fact, that she is a "phenomenal" worker.

She then began to talk about various "hired guns." Beside Dr. Kaldor, she is particularly angry at Dr. Andrew Whyman, who she described as rude, cruel and a liar. She said his office is in a vault and it should be because of how dangerously he lives.

Continuing with the ways in which she feels she has been damaged, she told me that she has felt humiliated and shocked. This is specifically due to an editorial that she believes the County was able to influence in the local newspaper. She said at that time she was working seven days a week and the defendants were planning to get rid of her. The article came out on May 12, 2004. She said there was a new intermittent Chief Administrative Officer and the announcement in the paper was that he was coming in to terminate the arrogant Head Director of CPS, that being herself.

As she seemed to run out of categories to describe the emotional damages she felt she suffered during her employment at Lassen County, I asked her some very specific questions. First I asked her whether she had any problems with sleep function. She told me that she has no problems falling asleep because she is worn out. However, she is restless and awakens during the night. She told me that she has never had sleep problems before. I have not had the opportunity to review any of her previous psychiatric records, the examinations from Dr. Kaldor or Whyman and have no way of verifying that.

7

She basically said for all of her symptoms that they began following her termination from Lassen County.  To continue with symptoms, she told me that her appetite varies a great deal, going for days without eating and then binging.  As I indicated earlier, her weight has gone up significantly. She said that since she is starting a new job next week, she is motivated to lose weight and she believes with the plan that she has of certain kinds of nutritional drinks, she should be able to drop 30 pounds in a month.

I also asked her about nightmares and she told me that she has lots of them, but she couldn't estimate the frequency, pattern, nor could she recall any one of those nightmares.

As to crying spells, she told me she has been having that the last six months or so.  This is during the period of her depositions being taken, being called a liar, and having to undergo these examinations and "watch out for the hired gun."

She also acknowledged that she has many physical symptoms that are sometimes stress indicators, such as gastric problems, bowel difficulties, rashes and headaches.  She said that she has a lot of stomach distress and that started about a year ago.  Similarly, she has been suffering from constipation.

Just a few months ago she started noticing rashes, typically on her arms and then eventually bleeding; she also develops non-bleeding rashes on her neck.  She said she is very embarrassed by the sight of this and wears long sleeves.  As she was looking at her arms, I did not notice any kind of marks.  She said that Dr. Agre has told her that it is a neurologic response to stress.

She said that she never had headaches in her entire life up until a couple of years ago.  They occur approximately weekly and develop during the day.

She denies any history of hallucinations, delusionary thinking, bizarre ideation, and there was no clinical evidence of any psychotic mentation, although she was extremely suspicious, all of which she attributes to the litigation process and how she has been treated in that by various people.

8

I also asked her about cognitive functioning and she told me that she has become so forgetful that she writes notes to herself sometimes as reminders. She said her memory was always excellent and that she was a superb worker and it is quite different now. She also acknowledged concentration problems, having difficulty following what she is reading, as well as following the plots of movies.

She told me that she found the position in Plumas County working for the Department of Social Service in their Child Protective Services Division. Her position will be Social Worker III. She said her duties there will be the typical ones in that position, including court reports and emergency responses and she said it is a very critical position, not unlike that of police officers or fireman who deal with life and death issues.

She said that Plumas County will ease her into the position. Initially they will keep her with court reports and away from any contacts with Lassen County. She said they share her disdain for Lassen County, told her that she should take it as a compliment that Lassen County let her go.

Apparently she applied for this position a few weeks ago, although there may have been some earlier efforts to recruit her. Bill Snitckin, the employee at Lassen County who she essentially tried to protect has been employed at Plumas County for about a year. I asked her whether she made any other applications and she said she applied for a position with Americorp. I believe she also said she applied for appropriate positions in other counties, although she wasn't very clear about that. I asked her whether she interviewed in person or on the phone and she told me that she drove to Plumas County for the interview.

### Review of Records

As indicated at the outset of this report I reviewed the depositions of Dr. Agre and of Ms. Henson, as well as a number of Declarations and the Complaint.

The Complaint indicates she was diagnosed by Dr. Agre as suffering from a number of disorders, including Post Traumatic Stress Disorder, Major Depression, Panic/Anxiety Disorder and Agoraphobia. Her Complaint refers to various allegations, including that the problems of the CPS unit

9

vis-à-vis the Grand Jury investigation were not known to
her when she was hired, that there were homophobic remarks
made about other persons, that she was pressured by the new
Director of Mental Health to hire his wife as a Social
Worker despite lack of qualifications.  She also said that
there were false accusations of sexual harassment made
against her by two of the female employees, that she was
instructed to act prejudicially towards an applicant
because of his HIV status, and that eventually there was a
conspiracy to make the working conditions so intolerable
that she would have to leave.  She alleges further that all
of this was because of her sexual orientation and gender.

Further, she complains of disparate pay based on gender,
that her office property was maliciously destroyed while
she was on medical leave, and the Complaint goes on to list
all the ways in which she believes she was damaged.

As to the Declaration of Linda Doty, she is the woman who
owns the home that Ms. Henson has been living in up until
her planned job in Plumas County.  Her Declaration
basically affirms that Deborah Henson is often unable to
leave the house, shares with her recurrent suicidal
thoughts and the point of the Declaration seems to be the
inadvisability or inability of her to attend an examination
in an unfamiliar place.

Dr. Agre's Declaration says that she does not have a normal
personality, that she is not able to participate in a
deposition for more than three-to-four hours per day or for
more than two-to-three days.  He also stated he did not
believe she was capable of participating in more than four
hours of psychological testing and no more than one-to-two
hours of forensic psychiatric evaluation.  He states that
she should not have to go to Menlo Park, but to have these
procedures done in a place closer to her home and more
familiar to her.  He indicates her diagnosis is Major
Depression, PTSD, Agoraphobia, and Anxiety/Panic Disorder.

Deborah Henson, herself, completed a Declaration, in which
she concurs with Dr. Agre's recommendation about the
parameters of her ability to participate in deposition and
forensic examination.

The only other record I reviewed other than her
depositional testimony and that of Dr. Agre's was a letter
she wrote to Dr. Agre on 03/27/07, the same day that she

10

executed her Declaration regarding the examination and depositions.

In her letter to Dr. Agre, she comments on Dr. Whyman's report, the many "untruths" and errors.  She refers to another psychiatrist that lied in his report and allegedly admitted it when he testified, Dr. Silberstein, and she said that he had also admitted that he tried to engage in inappropriate sexual behavior with her.  She uses rather dramatic language, including referring to some doctor as "the Devil."

In her own Declaration, she states that she cannot be deposed for more than three or four hours and two to three consecutive days and basis that on Dr. Agre's recommendation.  She also said she didn't think she could participate in a defense psychiatric forensic examination for more than one to two hours of an evaluator and no more than four hours of testing, this to be done in a familiar place.  She told me, however, that her examination with you took three or more hours.

In Dr. Agre's deposition he said that Ms. Henson was referred to him by a friend of hers, Linda Doty.  Insofar as his knowledge of Ms. Henson, she did not initially tell him she had filed any previous lawsuits, but she had at some later time, but he does not remember the specifics.  He believes that though she had a history of Panic Disorder, it has been in remission since 1984.  He was aware of Dr. Whyman's report, but not that of Dr. Kaldor.  He was aware she had been sexually abused by multiple perpetrators until the age of 13.  He said that he knew she was a lesbian and was in her present relationship with Ms. Doty for 14 years.

His initial diagnosis of her was Depression (NOS) and Anxiety Disorder and later changed that to Major Depressive Disorder.  He described his medication treatment of her.  At some point he made a diagnosis of Agoraphobia.  Later on in the deposition he said that she mentioned she had experienced that in the past as well.  However he said she was not having panic attacks.  He stated that she had no suicidal intention, quite different than the Declaration of her partner, Ms. Doty.  He could not explain some inconsistencies in which she stated she had attended different law schools.

11

As to his treatment, it varied from weekly to every couple of weeks and even sometimes monthly.

As of the time of Dr. Agre's deposition, he didn't know whether she would accept the job in Quincy that she had been offered, although by the time I saw her she had accepted it and was planning her move to Quincy.

Beside her work problems which she discussed with him frequently, she had a long history of issues with her mother who she felt was not supportive enough of her.

He said she had been on Social Security Disability in 1986 and had previously taken psychiatric medications.  She had issues in her relationship with a housemate, which they talked about intermittently in their meeting and characterized the relationship as waxing and waning.  One of the issues they had was apparently that Ms. Doty felt that Ms. Henson was occupying too much of Ms. Doty's time. If she moved to Plumas County it was not the intention for Linda Doty to relocate there.

He also discussed the ongoing stress from the legal situation and there began to be a number of references to her law case during her visits.

Since he was not aware that she had been examined in the eighties by Dr. Bruce Kaldor, he was obviously not aware that in his 1988 report he indicated she complained about phobias, unprovoked attacks of anxiety that were disabling. Dr. Agre is asked whether that report contradicts his statements that she had been in remission from her anxiety disorder since 1984 and he appears to agree.

Dr. Agre is also asked what he makes of the fact that neither Dr. Kaldor or Whyman's report make any mention of her history of molestation and his answer was that she saw those evaluations as non-therapeutic, essentially part of a legal process.  (It is difficult to understand why that would explain the omission of such potentially-relevant information.)

Another surprising statement is that she has Post Traumatic Stress Disorder, although he never had previously diagnosed her with that.  As to the stress that triggered the diagnosis, he said it was other traumas in her life, but the most recent one was the conflict at Lassen County.  He

12

seems to have some difficulty in explaining how she
qualified for that diagnosis based on the requirement of
the kind of trauma to qualify for that diagnosis.

He asked whether he considered Borderline Personality and
he said that he didn't think so and that maybe she had a
Personality Disorder (NOS).

She had not yet asked him to give her a medical release to
return to work and if she did, whether or not he would give
it would depend on the timing. However, he said that as of
that moment he probably would not. Again, he may not have
been aware she already accepted the job. He did state the
opinion that with the trial being set for February 2008, he
thinks it is questionable and problematic whether she can
return to work before the end of the legal process.

As I indicated, I had the opportunity to review both
sessions of Ms. Henson's deposition. First, I was struck
by how well she did during the many hours of the
deposition, far beyond what she estimated she could endure,
as well as her psychiatrist's projections. As I read her
depositions, there did not appear to be any signs of the
deterioration of her ability to testify over the hours that
the deposition was being conducted.

I will not review her depositions in any detail in this
report, except for a few comments.

She addresses her having lost her lawsuit in Solano County,
but as she did with me, seemed to emphasize that a woman
who sued for similar reasons later was successful.

She is not a licensed social worker, describes her
education and the many different jobs that she has had.
Some of them ended unhappily, including her leaving her job
in El Dorado County on stress leave. Understandably, a
good part of this deposition and the next deposition are
centered on her account of what happened at Lassen County
and the ways in which she felt she was mistreated.

She did tell the interviewers at Plumas County that she was
terminated from Lassen County, apparently not giving any
detail and as she indicated to me as well, they said it was
a compliment to be terminated. She appears to be
suggesting that people she spoke to at Plumas County share
her negative view of Lassen County. She did not, however,

13

tell them that she was involved in a lawsuit.  She also
expresses her apprehension about taking the job because of
her emotional condition.

Throughout her deposition there are discussions about her
work performance.  She states that given the bad shape and
backlog that she inherited, that she believes she was doing
very well and even refers to herself as working 24/7.
Obviously, she disagrees with being characterized as
incompetent.

Throughout, she clearly divides the many people with whom
she had contact in Lassen County as essentially friends
versus enemies.  She is clearly very angry at those that
she regarded unhelpful or antagonistic towards her and my
impression during my examination of her was also that she
tends to have extremely angry feelings about people with
whom she disagrees, feels she has been mistreated by,
failed her in some way.

As to Lassen County, her belief is that they set her up to
fail, that being based, again, on her not being informed of
the problems that the county was having prior to being
hired and that when she was hired, that resources and staff
were purposely withheld from her.

Psychological Test Results

I administered three psychometric tests to Ms. Henson; the
Millon Clinical Multiaxial Inventory-III (MCMI-III); the
Minnesota Multiphasic Personal Inventory-2 (MMPI-2); and
the California Psychological Inventory (CPI).

On the MMPI-2, she produced a very suspect profile, meaning
that on the one hand she claimed an unrealistic amount of
virtue, while at the same time endorsing a great number of
psychological difficulties.  This is a very infrequent
response pattern and reflects at least unconventional and
possibly bizarre beliefs.

The possible reasons for this type of test performance
include that she may have consciously distorted the test
responses to create a particular impression, or that she
may be generally unsophisticated. The latter does not seem
to fit.  If she was trying to control the results, the
attempt would have been to present herself as a kind of
faultless person, while at the same time an extremely

14

damaged one.  In fact, she even scored high on the scale
that includes those responses that not even people who are
diagnosed as Psychotic claim to be bothered by.

On the Clinical Scales, surprisingly, one of her lowest
scores is on Social Introversion despite her describing
herself as being agoraphobic, withdrawn and seclusive.  She
also scored high on a scale that attempts to measure post
traumatic stress disorder.

The profile of her symptomatic concerns would include
physical concerns, depressed mood, anxiety, tension and
unhappiness.  She also presents that she no longer enjoys
doing things and is not able to function well in life, as
well as being overly sensitive to criticism.  Her depressed
mood leads to physical complaints and fatigue.  The scores
suggest, however, that there are some long term personality
characteristics that influence her adjustment, including a
meager capacity to experience pleasure in life.  Even her
pervasive physical complaints may result at least in part
from this characteristic personality deficit.

The MMPI is of high profile stability and definition,
meaning that the same kind of configuration is likely to be
obtained if she is retested at some point in the future.

As to interpersonal relationships, she is passive-
dependent, easily hurt by others, as well as being shy and
inhibited.  She is emotionally alienated, likely to have
very few friends and to be considered difficult to get to
know.  She lacks self-confidence in dealing with other
people, has problems in asserting herself appropriately,
and frequently experiences being taken advantage of by
others.  These types of personality characteristics are
stable over time, meaning that they are not the response to
some adult experience.

Based on the MMPI-2, the most likely diagnosis is a
Dysthymic Disorder, in other words a long term depression.
As to treatment considerations, such individuals are best
treated with antidepressant medication.  They require a lot
of reassurance, are uninsightful and would respond best to
a direct and behaviorally-oriented approach and possibly
even assertiveness training.

Next is the MCMI-III, which showed a mild tendency to over-
emphasize problems.  On this test she did not apparently

15

try to present the socially desirable impression that she did while taking the MMPI-2.

The clinical syndromes here reveal an intense state of misery, torment and insecurity, pervasive anxiety and a clinical level of depression. She tends to dwell on past misfortunes and has a fear of the unknown. Self-harm and suicide may seem to be an option to her.

Regarding personality patterns, the combination includes such elements as being detached, avoidant and self-defeating. She directs a lot of her effort towards maintaining distance from others. She approaches many situations very carefully, even with dread. She may passively tolerate situations that might not be good for her.

She may have cognitive problems because of the interference of anxiety or depression, but also because of her personality problems.

Depression for her is severe, persistent and sometimes overwhelming. Because of her schizoid and avoidant personality, she maintains a great deal of emotional distance and becomes detached even from her own needs and feelings. She also experiences anxiety symptoms on a frequent basis, and again her personality problems probably dampen many of her reactions to stressful events. There is some evidence, although not strong, of the possibility of lasting or traumatic effects from a terrible incident earlier in her life.

Her somatic symptoms are vague or commonly stress-related and fall short of achieving diagnostic significance.

As to her social functioning, obviously the schizoid and avoidant personality traits suggest an extensive pattern of social isolation, and she approaches social interactions in a shy and inhibited way. Again this is not the result of any adult event, but part of her personality development. Similarly, the features of her schizoid and avoidant personality also affect her self-image. Finally, there are no indications of alcohol or drug abuse.

Based on the MCMI-III, the possibilities include Anxiety Disorder (NOS), Adjustment Disorder with Anxiety, Major Depressive Disorder, single episode, Major Depressive

16

Disorder, recurrent.  On Axis II, the candidates are
Schizoid Personality Disorder and Avoidant Personality
Disorder and the recommendation of ruling out a Personality
Disorder (NOS) (self-defeating.)

Her passive detachment would suggest a reluctance to become
involved in a therapeutic relationship and she is likely to
opt for a therapy with little personal and emotional
involvement.  Such a therapy would not be helpful if it
required insight and instead should focus on the most
practical matters.  She should also be encouraged to reduce
her extreme isolationism.  Work may be tolerated if there
are not excessive social demands.

The final instrument was the California Psychological
Inventory.  On this test, similar to the MMPI, she gave
some rare answers.  She appears to be a woman beset by
conflicts and to be a rather changeable person.  She is
slow to admit flaws in herself and has a perfectionistic
moral standard, in fact is described as tending to make
some claim to perfection of moral character.

She can be considered as being in poor mental health and
with serious emotional problems that not only trouble her
now, but can be expected to continue to do so for an
indefinite period of time.  She is insecure and
unpredictable and unstable.

She describes herself as feeling defeated and unhappy,
overwhelmed, essentially "a loser."  She is a passive and
unassertive person who thinks of herself as weak and
helpless.  This reliance on weakness and disability may be
her way of getting what she wants.  Apparently she learned
early on not to express her wants openly and instead to
express them in a passive and indirect way.

She is also a resentful person, again in a passive way and
tends to view certain people as foes.  They irritate her,
annoy her, rouse her resentment, or make her angry.

On the other hand, she can be an able and conscientious
person, industrious, efficient, capable and hardworking.
She stays with tasks to get them done.

Throughout her life she has been immature, naïve and an
emotional person and very dependent, someone who leans
heavily on other people.  When she is under stress, she

17

reverts to being discouraged, anxious and worried. During such episodes she may express her distress in physical symptoms or in having attacks of anxiety.

Her symptoms are designed to influence people, but she has no awareness of this, and she has a knack for convincing herself she is helpless and physically disabled.

At times she may seem theatrical or histrionic. However, she shows no signs of being psychotic or any tendencies toward that. She has some issues about what kind of person she wants to be.

Her attitude is mostly pessimistic, lacking confidence in herself. As indicated earlier, she is a dependent person and can be rather bitter and feel deprived or mistreated at times.

She can also be a somewhat hostile person who builds up resentment and then may lash out. She takes things out on herself as well. She can be self-blaming and turn hostility against herself.

She would not be considered as compulsive, instead flexible. She is not especially histrionic, although some signs of that do occur in the testing.

She appears to be an ethical person, voices that she believes in taking civic responsibility, but in practice her behavior may be more opportunistic compared to what she actually says.

She finds it difficult to accept rules of everyday life, but she does attempt to obey them and is usually successful.

The morality that she professes is described as unrealistic and self-deceptive. Consistent with the other tests, she is socially introverted.

As to world of work, she has average ability to perform work. In fact, in the long run, she may have more of what it takes to succeed than the average kind of person. The strongest point is her goal of succeeding, carefulness, accuracy and self-control. She can also be self-reliant and have good judgment.

As to work problem areas, she lacks ability to keep her
emotions from interfering with the teamwork that is needed
in a competitive work environment.  Personal resentments
may sway her and derail her.  Another possible drawback is
some lack of willingness to conform to the customs and
expectations of the social structure.  To some degree she
may be considered somewhat demanding or opinionated.

As to diagnostic possibilities, there is some evidence for
Obsessive-Compulsive Disorder, although this is not
verified by the other tests.  There are also some
possibilities that she somaticizes and may have
dissociative symptoms and manipulative acting-out.

She may have a reaction to situational stress with a
dramatically depressed mood.  There is also consideration
for a Simple Phobia, such as Agoraphobia or panic disorder.

Regarding personality-type difficulties, the main
candidates are histrionic or dependent.  There is some
chance she may make use of intensive psychotherapy.

Summary and Recommendations

This is the evaluation of Deborah Henson, a 54-year-old
woman who is suing her previous employer for a variety of
employment complaints centering on disparate and harassing
treatment of her, as well as being wrongfully terminated.
She believes that the maltreatment was based upon both her
sexual orientation and her gender.

Of all of the emotions this woman displayed and expressed
during the examination, anger was by far the most prominent
one.  Her degree of anger trumps any signs of depression or
anxiety.  She presents as a very bitter woman, very self-
righteous, and despite her protestation, very much a self-
defined victim.

As to the origin of these feelings, the psychological tests
suggest that she developed a personality which is based
upon schizoid and avoidant characteristics, unmet
dependency features, and a histrionic approach to life.

While I did not take the kind of detailed history that you
did in your component of the examination, there appears to
be a number of historical origins of these kinds of
feelings of victimization, deprivation and interpersonal

19

conflict. At the very least, there is some information about a challenging relationship with her mother, a history of her having been sexually molested on multiple times at a very early age, and then as a adult a number of conflict situations that played out in her jobs. Previous evaluations, some of them going back a number of decades, suggest that she was already suffering from many of the complaints that she attempts to characterize as Lassen-induced. She dismisses any evidence of that by blaming the respective examiners being malicious and untruthful and prejudiced, and I anticipate she will have the same reaction to this report.

I have no doubt that she is a tortured woman, that she suffers from low self-esteem, feelings of being abandoned and ignored, and that these play out in her work situations, likely in her childhood, and perhaps in some of her more current relationships.

She may very eagerly be vigilant to find new sources of malice in her life and to blame the most current "culprit." In the service of that, she tends to fashion her memory and her reports to comport with that purpose.

While a certain percentage of litigants are occupied or preoccupied with their litigation, she shows an unusually intense devotion to her lawsuit, looking to it to be the potential savior of her reputation. It appears, however, to only be the latest arena.

The kinds of personality characteristics that she displays in the interview include a sense of drama, hyperbole and extremism. When there is any attempt to make her be specific about certain complaints, she tends to become more vague.

As to diagnostic description, there is no real evidence of any Post Traumatic Stress Disorder. However, if in fact she does suffer from that, the events at Lassen County even if her description of those is one hundred percent accurate, it would not qualify as the precursor for that diagnosis. None of the events she described would satisfy the initial and basic requirement for the diagnosis of a Post Traumatic Stress Disorder. Again, if she has some post traumatic residuals, they would be more likely related to events much earlier in her life.

20

Based on the testing, there are some signs of both anxiety
and depression, but clearly outweighed by her personality
difficulties, which appear to affect her in many ways.

I would diagnose her as suffering from a Dysthymic
Disorder, long term and chronic, with the possibility of
intermittent periods of Major Depression, recurrent.   While
she describes anxiety-based disorders, the depressive
element seems to be much more prominent.

The psychological testing suggests that she suffers from a
number of personality disorders and I would summarize them
as Personality Disorder (NOS), with features of histrionic,
dependent, schizoid, avoidant.  Clinically she also shows
some of the characteristics of a Borderline Personality
Disorder, although there is no test verification of that.

I am also of the opinion that she is exaggerating her
symptoms, both for purposes of compensation, as well as to
punish those that she believes have harmed her.   It is
difficult to tell how the ending of her litigation will
affect her psychologically, but it is very unlikely that
she will do anything other than continue her pattern of
intermittent and recurrent conflicts.

I hope this report is of some help to you in your
evaluation of Ms. Henson.

Respectfully submitted,

Paul S.D. Berg, Ph.D.
Licensed Psychologist

21